Matter of Honovich v County of Putnam (2025 NY Slip Op 25093)

[*1]

Matter of Honovich v County of Putnam

2025 NY Slip Op 25093

Decided on April 16, 2025

Supreme Court, Putnam County

Grossman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on April 16, 2025
Supreme Court, Putnam County

In the Matter of the Application of Daniel Honovich, Petitioner, 
 For a Judgment pursuant to Article 78 of the Civil Practice Law and Rules

against
The County of Putnam and THE PUTNAM COUNTY LEGISLATURE, Respondents.

Index No. 502219/2024

Petitioner was represented by George J. Calcagnini, Esq.
Respondent County of Putnam was represented by Heather Marie Abissi, and Charles Compton Spain, County Attorney

Victor G. Grossman, J.

The following papers numbered 1 to 11 were read on Petitioner's application for an Order and Judgment pursuant to Article 78 of the Civil Practice Law and Rules:
Amended Notice of Petition — Verified Petition — Affirmation / Exhibits — Memorandum 1-4
Verified Answer — Affirmation in Opposition — Memorandum 5-7
Reply Affirmations (2) / Exhibits 8-9
Affirmation / Exhibits (Return) 10
Reply Affirmation / Exhibits [FN1]
11
Upon the foregoing papers, the Petitioner's application is determined as follows;
THE PETITION
This is a CPLR Article 78 proceeding wherein Petitioner seeks (1) a judgment vacating and annulling a determination of the Putnam County Legislature denying his application to have a farm known as "Ridge Ranch", located at 276 Quaker Road, Patterson, New York, included in the Putnam County Agricultural District, and (2) an order directing Respondents to include [*2]Ridge Ranch in the said Agricultural District. Petitioner contends inter alia that:
• the Legislature's determination was predicated on Ridge Ranch's failure to meet the requirement of Putnam County legislative resolution #139, adopted on July 12, 2007, that each parcel included in the Agricultural District "must contain at least 50% of Prime Farmland and/or Statewide important soils which are in the NYS Agriculture & Markets agricultural land soil groups 1-6";
• the denial of Petitioner's application on that basis was erroneous in law because Resolution #139 in that respect is at odds with, and hence superseded by, the NYS Agriculture & Markets Law criteria for inclusion of parcels in agricultural districts; and
• the denial of Petitioner's application on that basis was irrational, arbitrary and capricious and an abuse of discretion because the NYS Agriculture & Markets land / soil classifica- tion system (a) relates to crop production, not livestock operations like Ridge Ranch; and (b) was developed as a basis for determining assessment values for taxation purposes, and not as a criterion for inclusion of parcels in agricultural districts.
THE AGRICULTURE & MARKETS LAW
Relevant provisions of Article 25-AA of the NYS Agriculture & Markets Law ("Ag & Mkts") include the following:
Ag & Mkts §300 (Legislative Findings and Intent)
It is hereby found and declared that many of the agricultural lands in New York state are in jeopardy of being lost for any agricultural purposes. When nonagricultural development extends into farm areas, competition for limited land resources results. Ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements, often leading to the idling or con-version of potentially productive agricultural land.
The socio-economic vitality of agriculture in this state is essential to the economic stability and growth of many local communities and the state as a whole. It is, therefore, the declared policy of the state to conserve, protect and encourage the development and improvement of its agricultural land for production of food and other agricultural products. It is also the declared policy of the state to conserve and protect agricultural lands as valued natural and ecological resources which provide needed open spaces for clean air sheds, as well as for aesthetic purposes.
The constitution of the state of New York directs the legislature to provide for the protection of agricultural lands. It is the purpose of this article to provide a locally-initiated mechanism for the protection and enhancement of New York state's agri-cultural land as a viable segment of the local and state economies and as an economic and environmental resource of major importance.
Ag & Mkts §303 (Creation of Agricultural Districts)
Ag & Mkts §303 governs the creation of agricultural districts by county legislative bodies. The statute provides inter alia for public notice of proposals for agricultural districts, for referral of proposals to the county agricultural and farmland protection board (the "Ag Board") [*3]for its recommendations and proposed modifications, and for a public hearing. Subdivision "3" thereof further provides:
3. The following factors shall be considered by the county agricultural and farmland protection board and identified as issues for comment at the public hearing:
[a] the viability of active farming within the proposed district and in areas adjacent thereto;
[b] the presence of any viable farm lands within the proposed district and adjacent thereto that are not now in active farming;
[c] the nature and extent of land uses other than active farming within the proposed district and adjacent thereto;
[d] county developmental patterns and needs; and
[e] any other matters which the county legislative body deems to be relevant.
In judging viability, any relevant agricultural viability maps prepared by the commissioner shall be considered, as well as soil, climate, topography, other natural factors, markets for farm products, the extent and nature of farm improvements, the present status of farming, anticipated trends in agricultural economic conditions and technology, and such other factors as may be relevant.
Ag & Mkts §303-a (Review of Agricultural Districts)
Ag & Mkts §303-a provides for legislative at eight-year intervals of any agricultural district created pursuant to Ag & Mkts §303. Per Section 303-a(2)(b), the county legislature must direct the Ag Board to prepare a report concerning:
1. the nature and status of farming and farm resources within such district, including the total number of acres of land and the total number of acres of land in farm operations in the district;
2. the extent to which the district has achieved its original objectives;
3. the extent to which county and local comprehensive plans, policies and objectives are consistent with and support the district;
4. the degree of coordination between local laws, ordinances, rules and regulations that apply to farm operations in such district and their influence on farming; and
5. recommendations to continue, terminate or modify such district.
After receiving the aforesaid report and recommendations and conducting a public hearing, the county legislature per Section 303-a(3)(a) "shall make a finding whether the district should be continued, terminated or modified."

Ag & Mkts §303-b (Inclusion of Viable Agricultural Land In Agricultural Districts)
Ag & Mkts §303-b creates a six-step process for the inclusion of "viable agricultural land" in agricultural districts. "Viable agricultural land" is statutorily defined to mean "land highly suitable for a farm operation." Ag & Mkts §301(7). A "farm operation" is statutorily defined to mean "the land and on-farm buildings, equipment, manure processing and handling facilities, and practices which contribute to the production, preparation and marketing of crops, livestock and livestock products as a commercial enterprise " Ag & Mkts §301(11). 
First, a landowner may submit to the county legislative body "a request for inclusion of land which is predominantly viable agricultural land within a certified agricultural district . . . "
Second, the county legislature refers the request to the Ag Board, which must report its recommendations as to "whether the land to be included in the agricultural district consists predominantly of 'viable agricultural land' as defined in sub-division '7' of Section 301 of this article and the inclusion of such land would serve the public interest by assisting in maintaining a viable agricultural industry within the district." 
Third, the county legislature must hold a public hearing on the landowner's request.
Fourth, after the hearing the county legislature "shall adopt or reject the inclusion of the land requested to be included within an existing certified agricultural district." 
Fifth, '[u]pon the adoption of a resolution to include predominantly viable agricultural land, in whole or in part, within an existing certified agricultural district, the county legislative body shall submit the resolution, together with the report of the county agricultural and farmland protection board and the tax map identification number and tax maps for each parcel of land to be included in an agricultural district to the commissioner [of agriculture and markets]."
Sixth, and finally, "the commissioner shall certify to the county legislative body whether the inclusion of predominantly viable agricultural land as proposed is feasible and shall serve the public interest by assisting in maintaining a viable agricultural industry within the district or districts." If the Commissioner so certifies, the land becomes part of the agricultural district immediately upon such certification.
See, Ag & Mkts §303-b, subd. 1-6.
Ag & Mkts §304-a (Agricultural Assessment Values)
Ag & Mkts §304-a provides for the calculation of "agricultural assessment values" and taxation of agricultural land in accordance with "an agricultural land classification system based upon soil productivity and capability" established and maintained by the Commissioner of Agriculture and Markets. See, 1 NYCRR 370.1 et seq. "Land classification system" means "the system established by the commissioner incorporating soil productivity and capability for use by the State Board of Equalization and Assessment in determining the agricultural value per acre, pursuant to Section 304 of the Agriculture and Markets Law." 1 NYCRR 370.2(m).
Ag & Mkts §305-a (Coordination of Local Planning with the Ag & Mkts Program)
Ag & Mkts §305-a provides:
1. a. Policy of local governments.[FN2] Local governments, when exercising their power to enact and administer comprehensive plans and local laws, ordinances, rules or regulations, shall exercise these powers in such manner as may realize the policy and goals set forth in this article, and shall not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of this article unless it can be shown that the public health or safety is threatened.
b. Upon the request of any municipality, farm owner or operator, or a person or entity performing agricultural practices on behalf of a farm owner or operator, the commissioner shall render an opinion to the appropriate local government officials, as to [*4]whether farm operations would be unreasonably restricted or regulated by proposed changes in local land use regulations, ordinances or local laws pertaining to agricultural practices and to the appropriate local land use enforcement officials administering local land use regulations, ordinances, or local laws or reviewing a permit pertaining to agricultural practices.
c. The commissioner, upon his or her own initiative or upon the receipt of a complaint from a person within an agricultural district, may bring an action to enforce the provisions of this subdivision.
THE PUTNAM COUNTY AGRICULTURAL DISTRICT AND RESOLUTION #139
The Putnam County Legislature created the Putnam County Agricultural District by Resolution #81 of 2003. By Resolution #139, adopted July 12, 2007, the Legislature noted that various factors must be considered in determining whether lands are "highly suitable for agricultural production", and
RESOLVED, that in considering whether lands are viable agricultural lands and suitable for inclusion in the Agricultural District pursuant to Section 303-b of the Agriculture and Markets Law the following factors shall be considered:
• Are parcels currently being farmed;
• Are vacant lands or start up farms part of a current plan;
• Farmland parcels within or adjacent to a Critical Environmental Area or a sensitive natural resource must have a Conservation Plan developed by the Putnam County Soil & Water Conservation District:
• Mapping, review and an evaluation by the Putnam County Soil & Water Conservation District;
• Result of an on-site assessment conducted by members of the Putnam County Agriculture & Farmland Protection Board;
• Each parcel must contain at least 50% of Prime Farmland and/or Statewide important soils which are in the NYS Agriculture & Markets agricultural land soil groups 1-6;
• Farm operations must follow agricultural Best Management Practices;
• Each parcel must be free and clear of Town, State and Federal violations.
THE UNDERLYING PROCEEDINGS
Petitioner's Application For Inclusion of Ridge Ranch in the Agricultural District
In April 2024 Petitioner applied to the Respondents to have Ridge Ranch included in the Putnam County Agricultural District. Petitioner, a doctor of veterinary medicine, and his wife, who holds a B.S. in Animal Science with a specialty in livestock management, own and operate Ridge Ranch on 113.52 acres in Patterson, New York, where they breed and raise cows, mini-donkeys, chickens, goats and rabbits for sale. They also host groups and visitors for educational purposes relating to the animals and the ranch, a practice recognized in the Ag & Mkts Law as "agricultural tourism." Ag & Mkts §301(15). In 2023, the farming activities generated $66,000 in gross revenues, and the agricultural tourism another $34,000.
Approval By the County Agriculture and Farmland Protection Board
Nine of the eleven members of the Putnam County Ag Board inspected Ridge Ranch. Thereafter, pursuant to Ag & Mkts §303-b(2) the Ag Board by a vote of 9 — 2 approved the inclusion of Ridge Ranch in the Putnam County Agricultural District. 
Recommendation Against Ridge Ranch by the Legislature's Physical Services Committee
Petitioner's application for the inclusion of Ridge Ranch in the Putnam County Agricultural District came before the County Legislature's Physical Services Committee on July 23, 2024. In attendance were all nine members of the Legislature, legislative counsel, counsel for the Petitioner, and one Neal Tomann, Interim Director of the Putnam County Soil & Water Conservation District. Mr. Tomann, who had voted against Petitioner's application in the Ag Board proceedings, subverted the Ag Board's approval of Ridge Ranch before the Physical Services Committee. He did so mainly on two grounds: (1) Resolution #139, in that Ridge Ranch did not meet the requirement that each parcel included in the Agricultural District contain at least 50% of Prime Farmland and/or Statewide important soils which are in the NYS Agriculture & Markets agricultural land soil groups 1-6; and (2) SEQRA, in that Ridge Ranch did not have a site plan or stormwater protection plan in place to meet alleged environmental concerns over potential runoff from steep slopes into adjacent wetlands.
The transcript of proceedings before the Committee includes the following:
Mr. Tomann: . . . they don't have the requisite 50 percent in the Ag — in the Ag for the soil — the requisite soil composition. They did have a functioning farm. They did have livestock and some goats and things, but — and there was — it did garner a lot of support from the — from the Ag board, as you can see.
We did — we did get some feedback from Rich Williams; the supervisor from Patterson who expressed some concerns over ancillary uses some of these other functions that were going on, parties, and events. It came up. It is adjacent to a wetland. You know when you run a short EAF on these sites, it is adjacent to a wetland. And on a short EAF, they want you to explain what's been done with the mitigation. What's been done to mitigate the potential hazards, and have they been minimized to the maximum extent practicable, is the language they use.
And we don't have a — and maybe this speaks to something of the applicants. I mean, I don't — we don't guide the applicants. We are like, hopefully, the applicants are — when they're doing some planning, they talk to some people, maybe some surveyors and things, but we don't have a site plan, we don't have a stormwater protection plan. And there was some concern about that. Although they were running, I would say a robust farm. It was — and a respectable effort at that. Unfortunately, it falls outside of what this statute was meant to do . . .
Mr. Tomann: . . . this is not your statute, and this is not the land that the statute was meant to protect. They're very clear that they want to protect agricultural lands. This — this is built on very steep land. We don't have — again, we don't have a site plan. We don't have a stormwater protection plan. All these things that I wish were in place so we could help them along. But without that, it's really hard to — especially again, being close to wetlands, which is point — which gets pointed out in the SEAF.
So you — we can't ignore it. And so you — I think the legislature — I think you're at a juncture where you either — because once you allow somebody in the — this particular [*5]applicant has three parcels totaling 113 acres. 10 percent of which is considered soil groups one through six. So we're an advisory board. I have them might — I am definitely not in the majority on this, but I'm — you know, I'm here to give you advice. And I advise is stick with the statute because if you — if you deviate here, your equity is going to — you know, equity being what it is, then it's basically not going to be a rule anymore. And then you run into the environmental concerns, like, so again, the county is not in a good spot. You're either going to come across as being hard on farming or hard on the environment; one or the other. Because once you start allowing this kind of development and on steep slopes with shallow soils, you — you run into environmental problems.
Legislator Montgomery responded:
I think we're getting ahead of our jurisdiction here. I think our — the purpose of the Ag Board and the Ag Districts is to support farming in Putnam County. And when we start talking about jurisdiction over the wetlands and SEQRA, that's not our jurisdiction; that will fall under the town's purview, and they will impose those codes . . . .
Petitioner's counsel concurred:
. . . I'd also like to point out that items such as an EAF or a site plan, those are town-imposed regulations. And if there's no reason for my client to have required an EAF or a site plan, then it wouldn't be done. It's not part of the county's agricultural district application; it doesn't ask for that . . .
Mr. Tomann replied:
If I may, we have an obligation to any parcel that we want to affirm or want to approve and send to the state needs to be accompanied by SEAF. So we would be the one preparing the SEAF. So my point was it is difficult for the county, I think, to take — to make that step and then, and deliver a good faith — in good faith, a short environmental assessment form absent — absent a site plan or a — or a stormwater protection plan, specifically Question 13 on the SEAF, which asks you to explain why there's a check and the check goes in there automatically on an SEAF. You're near a wetlands, and they automatically check yes for you. And you need to explain what's been done to mitigate the environmental impact to the largest degree practicable. And that's not easy to do when you don't have a site plan or a stormwater protection plan.
Petitioner's counsel's rejoinder:
. . . It's just like the chicken or the egg here, right? I don't think it's fair to have it held against an applicant that they haven't had an EAF done because the Town hasn't required it while noting that an EAF will be done when being referred to the state.
The other thing that I wanted to point out is that in the recommendation from the Ag Board, there was no affirmative decision related to the soil setup. It says, "Questions were raised concerning the applicability of the — of the Resolution number 139 require- ment that each parcel must contain at least 50 percent of prime farmland and or statewide important soils, which are in the NYS agricultural and markets, agricultural land soil [*6]groups one through six." So it does appears that there is some ambiguity there . . .
Upon Chairman Ellner's query whether Ridge Ranch met the Resolution #139 soils requirement, Mr. Tomann responded:
No, sir, it did not. This was — again, it was — you had — no, you had 10 percent of the — of all — two of the parcels had zero and then one of the parcels had 4. 4 acres, which gave us a roughly 10 percent of the parcels combined at the requisite soil composition.
The Physical Services Committee by unanimous vote thereupon passed Chairman Ellner's motion to recommend to the Legislature that Ridge Ranch not be included in the Putnam County Agricultural District.
The Public Hearing
On August 6, 2024, the Legislature held a public hearing on the application. Legislator Ellner, Chairman of the Physical Services Committee, moved on behalf of the Committee to decline Petitioner's application (and, indeed, all pending applications) for inclusion in the Agricultural District.
The minutes of the public hearing contain the following statements:
Chairman Jonke stated that he would be inclined to vote in favor of these parcels, however, for the first time in eight (8) years as a Legislator, it was brought to his attention that Resolution #139 of 2007 states that parcels shall have 50% of prime farmland . . . He stated that he was supportive of amending Resolution #139 of 2007 to allow for inclusion, because apparently there were other parcels in the past that were included without looking at their soil types, which he believed was not right.He stated that he attended the Agricultural Board meeting, and the soil types were never brought up. Legislator Ellner . . . stated that as a Legislator and Chairman of the Physical Services Committee he was bound by the rules. He stated that the rules that exist today prevent him from voting in favor of any of these parcels. He stated that moving forward, Resolution #139 of 2007 would be reviewed and possibly modified.
Legislator Castellano . . . stated that he was bound by Resolution #139 of 2007.
Legislator Naclerio stated . . . that as a lawmaker it was her responsibility to be bound to follow State law and our resolution.
Legislator Ellner . . . stated that the Legislature at that time chose to exclude[] parts what was available to them under NYS law. He believed that the last time four (4) parcels were put up for inclusion, two (2) of them failed because they did not have the requisite 50% soil requirement. He explained that the 50% requirement is not only the quality of the soil, it also deals with steep slopes. He stated that he must follow Resolution #139 of 2007 . . .
Legislator Crowley believed that we have an antiquated resolution. She stated that the soil quality is not a law requirement, it is our resolution . . .
The Legislature deadlocked, voting 4—4 on Petitioner's application, and the matter was tabled. It was re-introduced at a special meeting held on August 20, 2024, whereupon the Legislature resolved to decline to include any of the parcels requested for inclusion in the Putnam County Agricultural District. The vote was 5-3, with Legislators Crowley, Gouldman and Montgomery dissenting.
[*7]LEGAL ANALYSIS
A. Review Pursuant to Article 78
In a proceeding pursuant to Article 78 of the CPLR, the petitioner may raise the questions whether the administrative body proceeded "in excess of jurisdiction" (CPLR §7803[2]), and whether its determination "was made in violation of lawful procedure, was affected by an error In a proceeding pursuant to Article 78 of the CPLR, the petitioner may raise the question whether a determination "was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion..." CPLR §7803(3). See, Matter of Peckham v. Calogero, 12 NY3d 424, 431 (2009).
B. County Authority Under the Agriculture & Markets Law
In Matter of Ball v. Town of Ballston, 173 AD3d 1304 (3d Dept. 2019), the Third Department discussed the interplay of municipal "home rule" powers and the Ag & Mkts §305-a requirement that local governments exercise their powers so as to realize New York State's declared policy of promoting agriculture:
A local government enjoys broad autonomy under "the 'home rule' provision of the New York Constitution," but that autonomy does not extend to actions "that conflict with the State Constitution or any general law" (Matter of Wallach v. Town of Dryden, 23 NY3d 728, 742, 743 [2014]; see NY Const, art IX, §2[c][ii]; Municipal Home Rule Law §10[1]). Among the general laws of New York is Agriculture and Markets Law article 25-AA, which "was enacted upon a finding that many of the agricultural lands in New York state are in jeopardy of being lost for any agricultural purposes due to local land use regulations inhibiting farming, as well as various other deleterious side effects resulting from the extension on nonagricultural development into farm areas" (Matter of Inter-Lakes Health, Inc. v. Town of Ticonderoga Town Bd., 13 AD3d 846, 847 [2004] . . . ; See Town of Lysander v. Hafner, 96 NY2d 558, 563 [2001]; Matter of Village of Lacona v. New York State Dept. of Agric. & Mkts., 51 AD3d 1319, 1321 [2008]). Agriculture and Markets Law article 25-AA is not aspirational; the Town is required to "exercise [its] powers in such manner as may realize the policy and goals" of the law (Agriculture and Markets Law §305-a[1][a]).
Matter of Ball v. Town of Ballston, supra, 173 AD3d at 1307.
As the Court of Appeals observed in Town of Lysander v. Hafner, 96 NY2d 558 (2001):
To foster the socio-economic vitality of agriculture in New York, the legislature gave county legislative bodies the power to create "agricultural districts" [cit.om.]. Lands falling within those "agricultural districts" may be entitled to various statutory pro- tections and benefits. As is relevant here, Agriculture and Markets Law §305-a(1)(a) mandates that, when exercising their powers to regulate land use activities, local governments must do so in a manner consistent with the policy objectives of Article 25-AA. Thus, the statute directs that local governments "shall not unreasonably restrict or regulate farm operations within agricultural districts in contravention of the purposes of this article unless it can be shown that the public health or safety is threatened" (id., §305-a[1][a]).
Town of Lysander v. Hafner, supra, 96 NY2d at 563 (emphasis added). See also, Lewis Family [*8]Farm, Inc. v. NYS Adirondack Park Agency, 64 AD3d 1009, 1014 (3d Dept. 2009) ("'farm operations' [are] exempt from local zoning regulations under Agriculture and Markets Law §305-a").
Counties, as well as cities, towns and villages, are included within the meaning of the term "local governments." See, NY Const, art IX, §3(d)(2); Municipal Home Rule Law §2(8). Pursuant to Ag & Mkts §305-a(1)(a), then, the county legislature when exercising its home rule powers relative to agriculture must act in such manner as may realize the policy and goals of the Ag & Mkts law. That said, the Ag & Mkts law having created "a locally-initiated mechanism for the protection and enhancement of New York state's agricultural land as a viable segment of the local and state economies and as an economic and environmental resource of major importance" (Ag & Mkts §300), Article 25-AA accords the county legislature a considerable measure of discretion in determining how best to carry out state agricultural policy in its locality within a prescribed framework for establishing agricultural districts and for including agricul- tural land therein.
The legislature is authorized and indeed directed to consider an open-ended list of fact-intensive factors in establishing an agricultural district, including "the viability of active farming within the proposed district"; "the presence of any viable farm lands . . . not now in active farming"; "the nature and extent of land uses other than active farming"; and "county developmental patterns and needs." Ag & Mkts §303(3). In judging "viability", moreover, the legislature "shall" consider a broad array of relevant information including "relevant agricultural viability maps prepared by the commissioner . . . soil, climate, topography, other natural factors, markets for farm products, the extent and nature of farm improvements, the present status of farming, [and] anticipated trends in agricultural economic conditions and technology . . . " Id. The determination whether or not to include an applicant's land in the agricultural district which the legislature has created likewise requires the application of factually intensive criteria, to wit, whether the parcel in question is (1) "predominantly" (2) "viable agricultural land", i.e., "highly suitable for a farm operation", (3) the inclusion of which "would serve the public interest by assisting in maintaining a viable agricultural industry within the district." Ag & Mkts §303-b (1, 2, 4); Ag & Mkts §301(7).[FN3]

The Ag & Mkts law thereby invests the county legislature with discretion in the process of establishing agricultural districts and approving the inclusion of agricultural land therein. The end result of the legislature's deliberations on such highly fact-laden, qualitative standards as land's viability for agricultural use and suitability for farm operation in light of local conditions is entitled to deference provided that the legislature abides by the Ag & Mkts law and meets its obligation to act in such manner as may realize Ag & Mkts law policy and goals.
C. Disqualification of Ridge Ranch for Inclusion in the County Agricultural District Based on the Soils Requirement of Resolution #139 of 2007 Was Arbitrary and Capricious, Irrational, and Clearly Violative of Ag & Mkts §§ 303-b and 305-a
Resolution #139 of 2007 established criteria for determining "whether lands are viable [*9]agricultural lands and suitable for inclusion in the Agricultural District pursuant to Section 303-b of the Agriculture and Markets Law." As noted above, Ag & Mkts §303-b authorizes and directs the county legislature to consider an open-ended array of factors and information in assessing "viability." The specific provision at issue here, however, is framed not as one factor among many for consideration, but as a sine qua non or disqualifier, to wit:
Each parcel must contain at least 50% of Prime Farmland and/or Statewide important soils which are in the NYS Agriculture & Markets agricultural land soil groups 1-6.
Having "50% of Prime Farmland and/or Statewide important soils" would be desirable for a "farm operation" devoted to "the production, preparation and marketing of crops" (Ag & Mkts §301[11]), and the legislature might readily find that crop production in poor soil would not long be "viable." Here, however, the soils requirement was utilized to disqualify a ranch — that is, a "farm operation" devoted to "livestock and livestock products as a commercial enterprise" (Ag & Mkts §301[11]) — from inclusion in the agricultural district. 

The Petition asserts that there is no rational basis therefor:
29. Making soil type a stand alone disqualifying factor may have some merit when applied to a farm raising food crops. However, it is completely irrational when applied to a livestock farm, such as Petitioner's. Livestock, such as Petitioner's cattle, goats and donkeys, graze in pastures and are fed grains and hay purchased from feed stores. Soil type has absolutely nothing to do with a farm such as Petitioner's. Making soil type a requirement for admission of a livestock farm into the Agricultural District has no rational basis.
30. While prime soil types are essential for maximizing crop yields and economic returns from crop production, livestock breeding can effectively utilize a wider range of soil types and conditions. Properly managed grazing on marginal lands can actually contri-bute to soil health and biodiversity by the addition of manure to the soil, thereby sup-porting sustainable farming practices.
31. Livestock farming primarily requires land [for] grazing and growing fodder, which can be done on less fertile soils compared to those needed for high yield crop production. Forage crops like grasses and legumes used in pastureland can thrive in a broader range of soil types, including those not classified as prime farmland.
32. Livestock operations can utilize marginal lands that are less suitable for crop production but can still support grazing and hay production. This allows prime farmlands to be reserved for high value crop production. Pasture and rangeland management practices can adapt to varying soil conditions and topographies, making them less dependent on prime farmland characteristics. Utilizing non-prime farmland for livestock actually helps prevent the overuse and degradation of prime agricultural soils, ensuring their preserva-tion for future crop production. A rational regulatory approach to the agricultural dis- tricts would be to encourage livestock production on non-prime soils leaving the prime soils for crop production. However, the Respondents' approach encourages a waste of the prime soils lands.
In denying Petitioner's accusation of irrationality, Respondents do not meet or even address the asserted factual basis for Petitioner's claim but advert instead to alleged environmental impacts of waste run-off and soil erosion resulting from "farming on steep, inappropriate soils." The [*10]Answer states:
" . . . increased demand for agricultural land will tend to induce cultivation of the most cheaply available but previously idle land, which often will be abandoned or previously uncropped land of low quality and susceptible to erosion. Farming such lands may result in permanent damage to the lands themselves and may cause severe environmental problems as well." (Agricultural Districts and Zoning: A State-Local Approach to a National Problem by Karl E. Geiger; Ecology Law Quarterly (1980) p. 662)
"Conversion or re-conversion of erosion-prone lands to agricultural use may permanently reduce the productive capacity of such lands and will significantly increase water pollu- tion. (44.d, increased erosion may be the greatest danger posed by the current trends of agricultural land conversion. In addition to the long-term hazard of soil depletion and, ultimately, desertification, see E. Eckholm, Losing Ground 58-73 (1976); Dregne, Desertification: Man's Abuse of the Land, 33 J. Soil & Water Conservation II (1978), eroding soil carries into watercourses substantial quantities of silt and sediment, see id. at 12-13, accompanied by chemicals from fertilizers, herbicides, and pesticides that have bonded to soil particles, causing water to become unsafe for humans and wildlife. Council on Environmental Quality, Environmental Quality-1976, at 24 (1976); Krivak, Best Management Practices to Control Nonpoint Source Pollution from Agriculture, 33 J. Soil & Water Conservation 161, 162, 164-65 (1978); Comment, Agricultural Nonpoint Source Water Pollution Control Under Sections 208 and 303 of the Clean Water Act: Has Forty Years of Experience Taught Us Anything?, 54 N.D. L.Rev. 589, 591-95 (1978). In the case of nitrogen fertilizer and phosphates, erosion and runoff lead to eutrophication, an excessive algae growth that suffocates other aquatic life. CEQ-1975, supra note 5, at 584-85; Brewer, Agrisystems & Ecocultures or: Can Economics Internalize Agriculture's Externalities? 53 Am. J. Agricultural Econ. 848, 852 (1971); Comment, supra, at 593 n. 24. Sedimentation fills in reservoirs and ponds, reducing their storage city for irrigation, domestic use, and production of hydroelectricity. The reduced availability of relatively erosion-free land will also hamper efforts to reduce agricultural nonpoint source pollution under §208 of the Clean Water Act, 33 U.S.C. §1288 (Supp. I 1977). This statute has yet to be broadly implemented in connection with agricultural nonpoint sources because of perceived difficulties in enforcing the drastic changes in farming practices that might be required to achieve significant reductions in agricultural pollution. As more highly erodible land is pressed into agricultural produc- tion, nonpoint source pollution will become more severe, and the difficulty and expense of controlling it will increase proportionately.
(Answer, pp. 14-15)
Respondents' argument is problematical in multiple respects. First and foremost, the authorities cited by Respondent are on their face addressed to land used for production of crops, and not for ranching activity like that to which Ridge Ranch is devoted. Mr. Tomann's implication at the Physical Services Committee meeting that there is some undefined connection between, on the one hand, Resolution #139's soils requirement, and on the other, Petitioner's conducting ranch activities on "steep slopes" with a potential impact on adjacent wetlands, is not supported by the cited authorities, and is, moreover, belied by the Department of Agriculture [*11]and Markets' own description of its "Agricultural Land Classification System for New York"[FN4]
, from which the County's soils requirement is derived. 
So far as is pertinent to the issues before the Court, that document states:
The purpose of the Agricultural Land Classification system is to evaluate and group the soils of New York on the basis of their productivity and capability. The primary use of the system is for taxation and assessments as provided by Senate Bill 8923-A and Assembly Bill 11551-A enacted by the New York State legislature in April 1980. Stipulation in this legislation was a land classification system to be developed by the New York Department of Agriculture and Markets in consultation with New York State College of Agriculture and Life Sciences at Cornell University. The State Division of Equalization and Assessment was directed to calculate land values for each soil group within the system using the income capitalization approach based on economic profiles developed by the New York State College of Agriculture and Life Sciences at Cornell University.
The Agricultural Land Classification system is a production rating system utilizing total digestible nutrients (TDN) as a measure of production. TDN was selected as the production function to permit a direct comparison of the corn and hay crops commonly grown within a rotation in New York. The corn and hay rotation was selected to compare soils because they are grown in most, if not all, regions and most soils within the State. There was also a need to provide a means to consider erosion control on most of the soils of the State. Generally a rotation of corn and hay will reduce the soil loss to permissible levels provided the number of years of corn is restricted.

 Construction of the System
The system uses the soil map unit as the key to the data base. The yields for corn and hay were estimated for each map unit that occurs within the State . . . .
The number of years corn can be grown in the rotation was determined by calculating the soil loss utilizing the "universal soil loss equation" and comparing this loss with the permissible loss . . . for that soil map unit. The years of corn were restricted to main-tain the average soil loss for the 10 year rotation at or below the permissible soil loss.
The TDN was computed for the prudent management yields utilizing the equation:
TDN = (Years Corn * Yield Corn * 0.2 + [(10-years Corn) * Yield Hay * 0.5]
. . . Using the TDN yield, an index Value was calculated to compare soil map units. The index value is computed as:
Index = TDN of soil map unit X 100
TDN for best soil
This index is the yield of TDN with respect to the yield on the "best" soil within the state.
The soils are placed into 10 groups based upon the index value . . . Groups 1 through 6 are subdivided into a high and a low lime to account for the cost of lime in the budgets.
. . .
Using the Conservation Needs Inventory date the acres of each soil in corn and hay were [*12]estimated. The prudent management yields were compared to state average yields and an equation was developed to convert prudent management yields to average management yields. This equation is as follows . . . :
Avg Mgt Yields = Prudent Mgt Yield x Conversion Factor
[Discussion of average management yields for Soil Groups 1 through 7]
The limitations for Group 8 Soils are usually so large that the land should be limited to pasture; therefore, no corn yield is given for a Group 8 soil and the hay is limited to removal by pasture . . .
[Table of "Values used to place soils into 10 soil groups and convert from prudent management to average management yields."]
The yields used for the construction of budgets are means of the average management yields of all soil map units within that soil group. The years of corn within the rotation is the median number of years for the group. (NYS Ag & Mkts Agricultural Land Classification System for New York [emphasis added])
The "Agricultural Land Classification System for New York" is admittedly complex, but its significance for the issues before the Court may be distilled from definitions given for key terms in the document, to wit:
SOIL GROUP: "[T]he group from one to ten in which the soil has been placed based on its 'index value.'"
INDEX: "[T]he TDN ['Total Digestible Nutrients'] yield compared to the best soil within the State (expressed as a percent of the best yield) . . . ."
TDN: "[T]he yields in tons/acre of total digestible nutrients computed from a 10 year rotation of corn and hay by the equation: TDN = (Years of Corn X Corn Yield X 0.2) + [(10 years corn) X Yield Hay X 0.5]."
YEARS: "[T]he number of years of corn (or other row crops) that can be grown in a corn-hay rotation without exceeding the permissible soil loss by erosion without the use of additional practices such as cover crops, no-till practices, etc. Permissible soil loss is equivalent to the estimated rate of soil formation, thus it is soil loss permitted without loss in productivity. The soil loss is calculated using the length and steepness of slope, soil erodibility, soil cover and rainfall intensity factor within the Wischmeier or soil loss equation."
(NYS Ag & Mkts Agricultural Land Classification System for New York)
The foregoing makes clear how utterly irrelevant to Ridge Ranch's application for inclusion in the Putnam County Agricultural District is Resolution #139's soils requirement.
Resolution #139 requires that each parcel proposed for inclusion in the Agricultural District "must contain at least 50% of Prime Farmland and/or Statewide important soils which are in the NYS Agriculture & Markets agricultural land soil groups 1-6." Those "soil groups" are part of the "Agricultural Land Classification System for New York" developed by the Department of Agriculture and Markets pursuant to Ag & Mkts §304-a, which provides for the calculation of "agricultural assessment values" and taxation of agricultural land in accordance with "an agricultural land classification system based upon soil productivity and capability" established and maintained by the Commissioner of Agriculture and Markets. In other words, [*13]the soil groups were developed as a measure of agricultural land value for purposes of assessment and taxation, not as a criterion for inclusion of land in an agricultural district.
The "assessment value" of the land depends on the quality of its soil for crop production, measured in terms of "the yields in tons/acre of total digestible nutrients." Ag & Mkts divided New York soils into soil groups, numbered "1" through "10", best to worst measured in terms of crop yields and advised that the lesser soils (Group 8) be "limited to pasture" — which is precisely the purpose to which Ridge Ranch devotes its land.
The Agricultural Land Classification System for New York (with its associated soil groups) is concerned with erosion only insofar as it affects the value of land for crop production; that is, insofar as crop rotation, which reduces average yields, must or should be practiced to avoid excessive loss of soil. For valuation purposes, the System factors in "the number of years of corn (or other row crops) that can be grown in a corn-hay rotation without exceeding the permissible soil loss by erosion without the use of additional practices such as cover crops, no-till practices, etc." This, quite obviously, has nothing whatsoever to do with ranching on steep slopes.
The Court accordingly finds that the Respondents' disqualification of Ridge Ranch for inclusion in the County Agricultural District based on the soils requirement of Resolution #139 of 2007 was arbitrary, capricious, and wholly irrational. 
Furthermore, the Court holds that the Respondents' disqualification of Petitioner's agricultural land from inclusion in the County Agricultural District based on this arbitrary criterion is plainly violative of the Ag & Mkts §303-b. Under Section 303-b, the Legislature was required to assess (1) whether Petitioner's land consists "predominantly of 'viable agricultural land' — i.e., "land highly suitable for a farm operation", including that devoted to "livestock and livestock products as a commercial enterprise"; and (2) whether the inclusion of Petitioner's land "would serve the public interest by assisting in maintaining a viable agricultural industry within the district." See, Ag & Mkts §303-b, subd. 1-4; Ag & Mkts §301, subd. 7, 11. The Legislature short-circuited that inquiry by applying the Resolution #139 soils requirement as a disqualifier and thereby failed to carry out its statutory duty.
Finally, the Court holds that the Respondents' conduct in that regard was plainly violative of their statutory obligation to exercise their powers in such manner as may realize the policy and goals of the Agriculture and Markets Law, including inter alia the protection and enhancement of agricultural land as a viable segment of the local and state economies. See, Ag & Mkts §§ 300, 305-a(1)(a); Matter of Ball v. Town of Ballston, supra; Town of Lysander v. Hafner, supra.
D. SEQRA
It is unclear from the record of proceedings herein whether the SEQRA concerns articulated by Mr. Tomann at the Physical Services Committee meeting — more specifically, the Petitioner's failure to present a site plan or stormwater protection plan  played any part in the Legislature's denial of his application for the inclusion of Ridge Ranch in the Putnam County Agricultural District.[FN5]
Mr. Tomann's suggestion to the members of the Legislature that site plans [*14]and stormwater protection plans are needed for the Legislature to carry out its obligations under SEQRA in this context is clearly erroneous, for those items having nothing whatever to do with the SEQRA inquiry that must be conducted in connection with legislative approval for the inclusion of land in an agricultural district. If in fact the Legislature denied Petitioner's application on that ground then its determination was affected by yet another error of law.
The Court is aware of only one prior decision which addresses the application of SEQRA in the context of an Ag & Mkts §303-b request for inclusion of land in a county agricultural district. See, In re Village of Islandia v. Ball, 2020 WL 7091325 (Sup. Ct. Albany Co., Aug. 21, 2020). The Village of Islandia Court held that a county legislative resolution expanding an agricultural district pursuant to Ag & Mkts §303-b constitutes a SEQRA "action" within the meaning of 6 NYCRR 617.2(b)(3); that such resolution constitutes an "Unlisted Action" per 6 NYCRR 617.2(al) and not a Type II action because 6 NYCRR 617.5(c)(46) does not exempt the "actions of local legislative bodies" from scrutiny under SEQRA; and that since the county resolution is a condition precedent to the Commissioner of Agriculture's certification, through a two-step process under Ag & Mkts §303-b, the county must necessarily act as the "lead agency" per 6 NYCRR 617.2(v) in carrying out the requisite SEQRA review. See id., at *7-10. 
The Village of Islandia Court's analysis, so far as it goes, is unimpeachable. However, the Court did not address a further question, relative to the scopeof SEQRA review, that is of paramount importance in the case at bar. 
6 NYCRR 617.5(c)(4) explicitly exempts "agricultural farm management practices" from SEQRA review. Section 617.5 states:
(a) Actions or classes of actions identified in subdivision (c) of this section are not subject to review under this Part, except as otherwise provided in this section. These actions have been determined not to have a significant impact on the environment or are otherwise precluded from environmental review under Environment Conservation Law, Article 8. The actions identified in subdivision (c) of this section apply to all agencies.
(b) . . . .
(c) The following actions are not subject to review under this Part:
. . . .(4) agricultural farm management practices, including construction, maintenance [*15]and repair of farm buildings and structures, and land use changes consistent with generally accepted principles of farming.
6 NYCRR 6.17(5)(a, c). See, Humane Society of the U.S. v. Empire State Development Corp., 53 AD3d 1013, 1018 (3d Dept. 2008) ("'Agricultural farm management practices,' including manure management, are expressly deemed to be Type II actions and, thus, the state respondents rationally concluded that the contemplated project is exempt from review"); Pure Air and Water Inc. of Chemung County v. Davidsen, 246 AD2d 786, 787-788 (3d Dept.), appeals dismissed 91 NY2d 955 (1998), 93 NY2d 567 (1999), lv denied 92 NY2d 807 (1998) ("SEQRA exempts agricultural farm management practices from review").
Accordingly, the Department of Agriculture and Markets specifically advises county legislative bodies that in making an environmental impact assessment of a proposed modification to a county-adopted, State-certified agricultural district:
[T]he reviewer should keep in mind that the action proposed is the modification . . . of an agricultural district(s). The action is not the land use or activity which will, or may, take place in the district(s). For example, it is not appropriate to consider the effects of management actions that may be taken by individual operators in conducting farming. Agricultural farm management practices, including construction, maintenance and repair of farm buildings, and land use changes consistent with generally accepted principles of farming are listed as Type II actions in 6 NYCRR §617.5(c)(4), and these actions have been determined not to have a significant impact on the environment.
(NYS Department of Ag & Mkts Short Environmental Assessment Form, p. 3 [emphasis added])
Thus, the land use or activity that will or may take place on Ridge Ranch, or the effects of management actions that are or may be taken by Petitioner in conducting a farm operation on Ridge Ranch, are not within the scope of SEQRA reviewof Petitioner's application for inclusion of Ridge Ranch in the County Agricultural District. That is because (1) the only SEQRA action under review is the Legislature's modification of the Agricultural District, and (2) farm manage- ment practices have been determined as a matter of law not to have a significant impact on the environment. See, 6 NYCRR 6.17(5), subd. (a) and (c)(4). Consequently, Petitioner's lack of a site plan or stormwater protection plan is wholly immaterial to his application for inclusion of Ridge Ranch in the County Agricultural District and to the SEQRA review that must accompany legislative approval of the application.[FN6]

E. Exhaustion of Remedies
Respondents in their Answer object that Article 78 review is barred on the purported ground that the Legislature's determination is not final and Petitioner failed to exhaust administrative remedies. Preliminarily, Ag & Mkts Law §303-b affords Petitioner no right of appeal to the Commissioner of Agriculture and Markets from the Legislature's determination to reject his application for the inclusion of Ridge Ranch in the County Agricultural District. Only if the Legislature were to have approved the application would the matter have been submitted to the Commissioner for certification. See, Ag & Mkts §303-b (4, 5, 6). However, Respondents claim that Petitioner did not exhaust administrative appeals from the legislative denial of his application for inclusion in the County Agricultural District via (1) Ag & Mkts §305-a(b, c); (2) Ag & Mkts §302(2); (3) Ag & Mkts §308; and (4) Ag & Mkts §5. 
In Watergate II Apartments v. Buffalo Sewer Authority, 46 NY2d 52 (19878), the Court of Appeals articulated the doctrine of the exhaustion of administrative remedies:
It is hornbook law that one who objects to the act of an administrative agency must exhaust available administrative remedies before being permitted to litigate in a court of law [cit.om.]. This doctrine furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency [cit.om.], preventing premature judicial interference with the administrator's efforts to develop, even by some trial and error, a co-ordinated, consistent and legally enforceable scheme of regulation and affording the agency the opportunity, in advance of possible judicial review, to prepare a record reflective of its "expertise and judgment" [cit.om.].
Watergate II Apartments v. Buffalo Sewer Authority, supra, 46 NY2d at 57. Were the issue presented here solely a matter of the reasonableness of Resolution #139's soils requirement, it can scarcely be doubted, given the highly technical nature of soils science (see, pp. 15-20, supra), that review by the Commissioner of Agriculture and Markets would advance the goals of the exhaustion doctrine in "preventing premature judicial interference with the administrator's efforts to develop, even by some trial and error, a co-ordinated, consistent and legally enforce- able scheme of regulation and affording the agency the opportunity, in advance of possible judicial review, to prepare a record reflective of its 'expertise and judgment'." See, id.
However, this case involves more: Respondents' misinterpretation of the requirements of [*16]the Ag & Mkts Law and of SEQRA resulted in legislative action violative, as a matter of law, of Respondents' duty and of Petitioner's rights under the Ag & Mkts law. 
In O'Connor v. Emerson, 196 A.D. 807 (4th Dept.), aff'd 232 NY 561 (1921), the Court wrote:
[W]here the right of a party depends upon the interpretation of a statute and it is claimed that a [public entity or official] has proceeded to act in violation of an express statute, and thereby the party complaining is being deprived of valuable rights, the courts will not be ousted of jurisdiction to determine the matter, notwithstanding another method of settling the controversy has been provided.
Id., 196 AD at 810. Accordingly, the doctrine of exhaustion of remedies does not bar Article 78 review of administrative action where "the issue raised involves a pure question of law" (Cady v. Clark, 176 AD2d 1055, 1056 [3d Dept. 1991]); "the issue . . . is one of pure statutory analysis . . . and can be decided as a matter of law" (Empire State Bldg. Co. v. NYS Department of Taxation and Finance, 150 Misc 2d 747, 749 [Sup. Ct. NY Co. 1990], aff'd 185 AD2d 201 [1st Dept. 1992], aff'd 81 NY2d 1002 [1993]); "the [administrative] decision rested on a misinterpretation of a statute" (Wilson v. Macchiarola, 79 AD2d 638, 640 [2d Dept. 1980]; or "the reason given for respondent's action in denying approval . . . was patently erroneous as a matter of law" (Dobbs Ferry Hospital Ass'n v. Whalen, 62 AD2d 999 [2d Dept. 1978]).
The Second Department's decision in Dobbs Ferry Hospital Ass'n v. Whalen, supra, is on point. The Court wrote:
[T]he respondent advised the petitioner, by letter, that the proposed project, previously approved, had been reconsidered and was being disapproved on the basis of a lack of public need. It informed the petitioner that it could request a public hearing. No hearing was requested; instead petitioner commenced this proceeding to review respondent's determination and for an adjudication that it is entitled to proceed with construction of the new facility. We hold that the determination of the respondent, denying approval of the construction plans for a hospital project upon the ground of a lack of public need therefor, was arbitrary and capricious because respondent's own regulation does not provide for denial of approval on that ground [cit.om.]. Petitioner did not have to exhaust its administrative remedies by requesting a public hearing because the reason given for respondent's action in denying approval of the construction documents was patently erroneous as a matter of law. Accordingly, we have directed a remand to the respondent for reconsideration of petitioner's application for approval of construction plans.
Id., 62 AD2d at 999 (emphasis added). Similarly, in Wilson v. Macchiarola, supra, where the petitioner claimed that a denial of tenure "rested on a misinterpretation of a statute", the Second Department held that "direct resort to the courts was proper" and hence the Court need not reach the question of exhaustion of administrative remedies. See id., 79 AD2d at 640.
Here, likewise, the grounds upon which the Legislature declined to include Petitioner's land in the County Agricultural District — an allegedly disqualifying failure to meet Resolution #139's soils requirement (and, perhaps, the absence of a site plan and stormwater protection plan) — were for the reasons stated above patently erroneous as a matter of law. Accordingly, exhaustion of administrative remedies is not here required, and Petitioner's immediate resort to [*17]the Court for Article 78 review was proper.
Furthermore, exhaustion of administrative remedies is not required where it would not, or would likely not, afford the petitioner "adequate and complete relief." See, Haddad v. Salzman, 188 AD2d 515, 516 (2d Dept. 1992); Lesron Junior, Inc. v. Feinberg, 13 AD2d 90, 93-95 (1st Dept. 1961) ("if an administrative remedy would afford a plaintiff substantially less than adequate relief for a clear wrong, the failure to exhaust the same should not be regarded as a bar to the obtaining of complete relief in a court of equity"); Mrs. W. v. Tirozzi, 832 F.2d 748, 756 (2d Cir. 1987) (exhaustion not required when "it is improbable that adequate relief can be obtained by pursuing administrative remedies"); Statistical Pone Philly v. NYNEX Corporation, 116 F.Supp.2d 468, 480 (S.D.NY 2000). None of the statutory remedies cited by Respondents would afford Petitioner adequate and complete relief from Respondents' erroneous denial of his application for inclusion in the County Agricultural District.
Ag & Mkts §305-a(b) provides:
Upon the request of any municipality, farm owner or operator, or a person or entity performing agricultural practices on behalf of a farm owner or operator, the commissioner shall render an opinion to the appropriate local government officials, as to whether farm operations would be unreasonably restricted or regulated by proposed changes in local land use regulations, ordinances or local laws pertaining to agricultural practices and to the appropriate local land use enforcement officials administering local land use regula- tions, ordinances, or local laws or reviewing a permit pertaining to agricultural practices.
Section 305-a(b) does not authorize the Commissioner to grant Petitioner relief from the Legislature's determination under Ag & Mkts §303-b, but only to "render an opinion."
Ag & Mkts §305-a(c) provides:
The commissioner, upon his or her own initiative or upon the receipt of a complaint from a person within an agricultural district, may bring an action to enforce the provision of this subdivision.
Since Petitioner's application for inclusion in the County Agricultural District was denied, he does not qualify as a "person within an agricultural district" and has no standing to complain under Ag & Mkts §305-a(c). 

Ag & Mkts §302(2) provides:
Upon the request of one or more owners of land used in agricultural production the [county agricultural and farmland protection board] may review the land classification for such land established by the department of agriculture and markets, consulting with the district soil and water conservation office, and the county cooperative extension service office. After such review, the board may recommend revisions to the classifica- tion of specific land areas based on local soil, land and climatic conditions to the department of agriculture and markets.
As discussed hereinabove (pp. 17, 20), the referenced land classification system was established by the Department of Agriculture and Markets as a measure of agricultural land value for purposes of assessment and taxation, not as a criterion for inclusion of land in an agricultural district. See, Ag & Mkts §304-a; 1 NYCRR 370.1 et seq. Hence, Ag & Mkts §302(2) has no bearing of any kind on the Legislature's determination pursuant to Ag & Mkts §303-b to deny [*18]Petitioner's application.
Ag & Mkts Law §308 provides in pertinent part:
1. a. The commissioner shall, in consultation with the state advisory council on agriculture, issue opinions upon request as to whether particular agricultural practices are sound.
. . . ..
4. The commissioner, in consultation with the state advisory council on agriculture, shall issue an opinion within 30 days upon request from any person as to whether particular land uses are agricultural in nature. Such land use decisions shall be evaluated on a case-by-case basis.
Much like Ag & Mkts §305-a(b), Section 308 does not authorize the Commissioner to grant Petitioner relief from the Legislature's determination under Ag & Mkts §303-b, but only to "issue opinions."
Finally, Ag & Mkts §5 establishes the office of Commissioner of Agriculture and Markets and provides:
He shall be responsible for the enforcement and carrying into effect of the laws, rules and orders pertaining to matters as to which the department has functions, powers and duties.
The Department of Agriculture and Markets has no "functions, powers and duties" per se under Ag & Mkts §303-b unless and until the county legislature, acting pursuant to Section 303-b(5), adopts "a resolution to include predominantly viable agricultural land . . . within an existing certified agricultural district" and "submit[s] the resolution . . . to the [Commissioner]" — which never happened here. However, assuming that the Department is vested with "powers" via Ag & Mkts §305-a relative to the "matter" of the county legislature's exercise of its function under Section 303-b, then the Commissioner's power of enforcement is specifically defined in Ag & Mkts §305-a(b) and (c); and those provisions, as discussed above, afford Petitioner no adequate remedy here. 

In sum, Petitioner was not required to exhaust administrative remedies because the statutory mechanisms cited by Respondents would not afford Petitioner adequate and complete relief, and in any event because the grounds upon which the Legislature declined to include Petitioner's land in the County Agricultural District were patently erroneous as a matter of law, wherefore the Court notwithstanding the exhaustion doctrine retains jurisdiction to determine the matter pursuant to Article 78 of the Civil Practice Law and Rules. 
F. Remedy
Since the Putnam County Legislature's denial of Petitioner's application for the inclusion of Ridge Ranch in the County Agriculture District was irrational, arbitrary and capricious, and affected by an error of law, that determination must be vacated and annulled. However, Petitioner's request for a court order directing Respondents to include Ridge Ranch in the agricultural district is without basis in law.
Summarizing the law pertaining to "mandamus to compel", the Court of Appeals wrote:
A writ of mandamus "is an 'extraordinary remedy' that is 'available only in limited circumstances'" (Matter of County of Chemung v. Shah, 28 NY3d 244, 266 [2016], quoting Klostermann v. Cuomo, 61 NY2d 525, 537 [1984]). Such remedy will lie "only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law" (New York Civ. Liberties Union v. State of New York, 4 NY3d 175, 184 [*19][2005]; see also CPLR 7803[1]). While mandamus to compel "'is an appro-priate remedy to enforce the performance of a ministerial duty, it is well settled that it will not be awarded to compel an act in respect to which [a public] officer may exercise judgment or discretion'" (Klosterman, 61 NY2d at 539, quoting Matter of Gimprich v. Board of Educ. of NY, 306 NY 410, 406 [1954]). Discretionary acts "'involve[] the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result'" (New York Civ. Liberties Union, 4 NY3d at 184, quoting Tango v. Tulevich, 61 NY2d 34, 41 [1983]). Further, mandamus may only issue to compel a public officer to execute a legal duty; it may not "'direct how [the officer] shall perform that duty'" (Klostermanm, 61 NY2d at 540, quoting People ex rel. Schau v. McWilliams, 185 NY 437, 440-441 [1906]).
Alliance to End Chickens as Kaporos v. NYC Police Department, 32 NY3d 1091, 1093 (2018). See also, Hamptons Hosp. & Med. Ctr. v. Moore, 52 NY2d 88, 96 (1981). 

As noted above, the Legislature when exercising its home rule powers relative to agriculture must act consistently with the Ag & Mkts Law and in such manner as may realize New York State policy concerning the promotion of agricultural activity. However, as Legislative determinations under the law are dependent on such highly fact-laden, qualitative standards as land's viability for agricultural use and suitability for farm operation in light of local conditions, the Ag & Mkts Law affords the legislature considerable discretion in the process of establishing agricultural districts and approving the inclusion of agricultural land therein. (See, pp. 13-14, supra). Petitioner does not have a clear legal right to have his land included in the County Agricultural District; the Legislature is entitled to exercise its judgment and discretion in applying the statutorily prescribed criteria to that matter; and mandamus to compel does not lie to compel the Legislature to reach a particular outcome with respect to a decision that turns on the exercise of such judgment or discretion. See, Alliance to End Chickens as Kaporos v. NYC Police Department, supra; Klostermann v. Cuomo, supra, 61 NY2d at 539-540. On the other hand, where a public officer or body has a mandatory, nondiscretionary statutory duty to decide a particular matter, mandamus to compel is an appropriate remedy to compel performance of the required duty even if the particular manner or outcome of that performance cannot be compelled. See, id.; Utica Cheese, Inc. v. Barber, 49 NY2d 1028 (1980) (agency was subject to mandamus for failing to conduct a hearing and decide petitioner's application for a license). 
The Legislature having denied Petitioner's application by erecting an arbitrary, irrational, and legally erroneous barrier to inclusion of Ridge Ranch in the County Agricultural District (to wit, Resolution #139's soils requirement and, perhaps, the absence of a site plan and stormwater protection plan), it never properly exercised its discretion under the true criteria established by the Agriculture and Markets Law. A proper exercise of discretion by the Legislature under the Ag & Mkts Law, and not an order whereby the Court substitutes its judgment for that of the lawfully constituted authority, is the proper remedy here.
G. Conclusion
The Court has considered the parties' remaining contentions and finds them to be without merit. For the reasons set forth hereinabove, Respondents' determination denying Petitioner's application for the inclusion of Ridge Ranch in the County Agricultural District is vacated and annulled, and the matter is remanded to the Putnam County Legislature for reconsideration.
It is therefore
ORDERED, ADJUDGED AND DECREED, that the final determination of the Putnam County Legislature passed on August 20, 2024, certified by the Clerk of the said Legislature on August 22, 2024 and approved by the Putnam County Executive on August 22, 2024 denying the application of petitioner Daniel Honovich to have his farm known as "Ridge Ranch" located at 276 Quaker Road, Patterson, New York included in the Putnam County Agricultural District is hereby vacated and annulled, and it is further
ORDERED, that the matter is remanded to the Putnam County Legislature for a reconsideration of Petitioner's application, consistent with this Decision, Order and Judgment, pursuant to Agriculture and Markets Law §303-b.
The foregoing constitutes the decision, order and judgment of the Court. 
Dated: April 16, 2025
Carmel, New York
HON. VICTOR G. GROSSMAN, J.S.C.

Footnotes

Footnote 1:By Order dated April 10, 2025, portions of this Reply Affirmation and Exhibits "O" and "P" thereto were stricken from the record.

Footnote 2:The term "local governments" includes "counties." See, NY Const, art IX, §3(d)(2); Municipal Home Rule Law §2(8).

Footnote 3:Conspicuously missing from Article 25-AA statutory factors and criteria is the environmental impact of the farm operation under consideration. Environmental considerations under SEQRA are addressed in Point D, infra, pages 21-24.

Footnote 4:The document is available on the Department of Agriculture and Markets' internet website.

Footnote 5:However, the minutes of a Physical Services Committee meeting on December 16, 2024 indicate that those SEQRA concerns were material to the Legislature's determination. The Court takes judicial notice of the said minutes, which are publicly available on the County of Putnam's official website. Among the items on the agenda for that meeting was a proposal to "amend the Agricultural District Application to require submission of a site plan, a stormwater protection plan and a soil survey for each parcel." Upon the invitation of Chair- man Ellner, Mr. Tomann addressed that proposal. According to Mr. Tomann, the proposal was introduced because "it is believed that there is more information needed to move the SEQRA process along." (Page 3)

Chairman Ellner observed that "during the review process of the applicants for consideration to be approved into the 2025 Ag District many issues arose, which by making the suggested amendments, would be avoided in future." (Page 4) It is readily inferable from the foregoing that the Legislature's denial of Petitioner's application for inclusion in the County Agricultural District was motivated, in part, by the lack of a site plan and stormwater protection plan even though (as Petitioner's counsel had stated at the July 23, 2024 Physical Services Committee meeting) such items were not then required as part of the Agricultural District Application.

Footnote 6:In Village of Islandia, the Court found that the county legislature had failed to comply with SEQRA and annulled its negative declaration because (1) among the criteria specified in 6 NYCRR 617.7(c) for deter- mining the significance of a proposed action's environmental impact is: "(iv) the creation of a material conflict with a community's current plans or goals as officially adopted or approved"; (2) inclusion of the petitioner's land within the county agricultural district would create a material conflict with the community's officially adopted plans because its agricultural use of the land in a residential zone was not a permitted use under the local zoning code, and a use variance was required but had not been obtained (see id., 2020 WL 7091325 at *4-5); and (3) the legislature had not taken the requisite "hard look" at the impact of including the petitioner's property in the agricultural district on the community or provided any reasoned elaboration for its conclusion. See id., at *10-12.

Village of Islandia is distinguishable in this regard from the case at bar because, so far as appears from the record, Petitioner's agricultural use of Ridge Ranch is wholly consonant with the Zoning Ordinance of the Town of Patterson. See, Patterson Town Code, Chapter 154, more specifically §154-26 (permitting farms in residential districts) and §154-46 et seq. ("Right to Farm" ordinance). Of note, Resolution #139 provides that each parcel proposed for inclusion in the Putnam County Agricultural District "must be free and clear of Town, State and Federal violations"; Petitioner's application was held in abeyance pending the clearance of Town of Patterson violations; and that all Town violations were in fact cleared before Petitioner's application was allowed to proceed.